UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DEXTER EARL HOLLINS,

                    Plaintiff,                Case No. 1:13-cv-8

v.                                      Honorable Janet T. Neff

CINDI CURTIN et al.,

                    Defendants.

_____/

## OPINION

        This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. On April 19, 2013, the Court issued an opinion and order (docket ##5, 6) dismissing the complaint in part for failure to state a claim, resulting in dismissal of Defendants Barber, Beckwith, Bradley, Heyns, Howes, Jacobsen, and Little.  The Court ordered service of the complaint on Defendants Ball, Curtin, McCarey, Sanders, Schiebner, and Thomas, solely with respect to a due process claim regarding Plaintiff's extended confinement in segregation.  On June 19, 2013, the Court denied Plaintiff's motion for reconsideration of the foregoing opinion and order (docket #21).  The matter presently is before the Court on Plaintiff's motion to amend the complaint (docket #23) and second motion for reconsideration (docket #41).  For the reasons that follow, Plaintiff's motion to amend will be granted, Plaintiff's motion for reconsideration will be denied, and the Court will order service of the amended complaint on Defendants Bengelink, Curely, Heyns, Miniard, and Sharp.

## I.  Motion to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, a party may amend its pleading once as a matter of course within 21 days after service of a responsive pleading or motion. Fed. R. Civ. P. 15(a)(1)(B).  Plaintiff filed his motion to amend before any of the Defendants filed a response to the complaint, so he may amend his complaint without leave of the Court.  Thus, the Court will grant Plaintiff's motion and his proposed amended complaint (docket #23-1) will become the operative complaint in this action (hereinafter, the "amended complaint").

Because this is a prisoner civil rights action, the amended complaint is subject to *sua sponte* dismissal to the extent that it is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.  *See* 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c).  Thus, the Court will analyze the allegations in Plaintiff's amended complaint and allow the claims therein to proceed only to the extent that they are not subject to dismissal for any of the foregoing reasons.  In conducting this analysis, the Court is mindful that it must read Plaintiff's *pro se* pleadings indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept his allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).

## II.  Amended Complaint (Factual Allegations)

Plaintiff Dexter Earl Hollins presently is incarcerated by the Michigan Department of Corrections (MDOC) at Saginaw Correctional Facility.  The events about which he complains occurred while he was incarcerated at other MDOC facilities:  Oaks Correctional Facility (ECF) and Lakeland Correctional Facility (LCF).  Defendants are employees of the MDOC.  In his *pro se* amended complaint, as in his original, he sues MDOC Director Daniel Heyns, Legislative

Corrections Ombudsman Keith Barber, and the following officials at LCF: Warden Carol Howes, Assistant Deputy Warden (ADW) Linda Beckwith, Assistant Resident Unit Supervisor (ARUS) J. Bradley, and Hearings Officer (unknown) Jacobsen. Plaintiff also sues the following officials at ECF: Warden Cindi Curtin; Deputy Warden Timothy Ball; Resident Unit Managers (RUMs) Robert Sanders and Jason Thomas; ARUS Robert McCarey (also spelled "McCary"); Inspector (unknown) Schiebner; and Librarian C. Little. The amended complaint also names as a defendant Regional Prison Administrator (RPA) (unknown) Curely, as well as the following employees of ECF: Deputy Warden (unknown) Sharp, RUM G. Miniard, and ARUS (unknown) Bengelink.

As in the original complaint, Plaintiff's amended complaint asserts claims with respect to three issues: (1) his confinement in administrative segregation; (2) the confiscation of certain funds from his prison account; and (3) an appeal in a federal habeas corpus proceeding that was not timely filed on his behalf by the prison legal writer program at ECF.

### 1. *Segregation*

On August 19, 2011, while Plaintiff was located at LCF, he was in the prison recreation area when another prisoner assaulted his friend, inmate Blythewood. Plaintiff allegedly left the scene soon after the assault began. Blythewood was taken to a hospital, where he died of his injuries. No prison guards witnessed the assault, and because it occurred in an unmonitored area, it was not recorded on the prison's security cameras. However, prison cameras recorded Plaintiff entering the recreation area with Blythewood before the assault, and then leaving the recreation area shortly thereafter. Plaintiff asserts that there were no statements or other evidence directly implicating him in the assault, but because he was seen entering the recreation area with Blythewood before it occurred, prison officials suspected that he might have been involved. That same day, he

was taken to a segregation holding cell pending further investigation. A prison official prepared a misconduct report charging him with attempted murder and accusing him of luring Blythewood into the prison yard so that he could be assaulted.

Seven days later, on August 26, 2011, Warden Howes allegedly "pulled" the misconduct report due to lack of evidence. (Am. Compl., docket #23-1, Page ID#152.) She replaced it with a notice of intent (NOI) prepared by ADW Beckwith to classify Plaintiff to administrative segregation, based on the asserted reason that the Michigan State Police (MSP) were investigating possible "felonious behavior" by Plaintiff. (*Id.*) Plaintiff received a hearing regarding the NOI on August 29, 2011. The hearing officer, Defendant Jacobsen, refused to review any evidence related to the assault. Jacobsen told Plaintiff that the sole purpose for the hearing was to confirm that the MSP were investigating him for his involvement in the assault on Blythewood. After the hearing, Jacobsen concluded that segregation was warranted because a letter from the state police indicated that Plaintiff "is involved with an investigation by the police for a felony complaint." (Ex. 1 to Compl., Segregation Classification Hr'g Report, docket #1-2, Page ID#28.) Plaintiff sought a rehearing, but the hearings administrator denied his request.

On September 1, 2011, Plaintiff was transferred to ECF and placed in administrative segregation. Plaintiff filed a grievance on September 19, 2011, complaining about the hearing conducted by Jacobsen. ARUS McCarey denied the grievance. Warden Curtin and Director Heyns upheld the grievance response at steps II and III of the grievance appeal process.

On September 22, 2011, Sergeant Jim Karbon of the MSP interviewed Plaintiff about the incident involving Blythewood. Deputy Warden Ball was present for the interview. Plaintiff explained that he was not involved in the assault and that he left the prison yard when Blythewood

was attacked.  Sgt. Karbon allegedly stated that he believed Plaintiff's story, and he told Ball that he considered Plaintiff to be a witness to the assault rather than a suspect.  Karbon indicated that he knew who committed the assault, and named another inmate.  Karbon asked Plaintiff to sign a statement saying that he saw that particular inmate commit the assault.  Plaintiff asked whether Karbon could have one of the other inmates who were present in the recreation area sign the statement, but Karbon responded that Plaintiff was the only witness because the other inmates claimed that they could not see who assaulted Blythewood.  Karbon told Plaintiff that if he did not sign the statement, he would face murder charges.  Plaintiff asked for an attorney, but Karbon told him that an attorney was not necessary because Plaintiff was not a suspect.  Plaintiff refused to sign the statement, and Karbon and Ball became angry with him.  Ball sent Plaintiff back to segregation, telling Plaintiff to notify Ball when he was ready to make a statement.

Plaintiff then filed a grievance complaining that he was being held in segregation without cause.  Sometime thereafter, prison officials at ECF reissued the misconduct report for the assault.  On October 14, 2011, a MDOC hearings officer allegedly found Plaintiff not guilty of the assault, noting Sgt. Karbon's statement on a police report that Plaintiff was a witness in the assault investigation.  Plaintiff remained in segregation, however.

The security classification committee at ECF met with Plaintiff on a regular basis to review his confinement in administrative segregation.  Attached to the pleadings are copies of "Segregation Behavior Review" forms with the following dates:  October 25, 2011; January 17, February 14, May 8, July 31, and October 23, 2012; and March 12, 2013.  (Ex. 1 to Compl., docket #1-2, Page ID##43-47; Attach. to Am. Compl., docket #23-2, Page ID##187-89.)  Each form sets forth the committee's recommendation regarding Plaintiff's continued confinement in segregation,

and the reason for that recommendation.  Plaintiff alleges that Deputy Warden Ball, Deputy Warden Sharp, ARUS Bengelink, ARUS McCarey, RUM Miniard, RUM Sanders, and RUM Thomas each participated in one or more of the security classification reviews as members of the committee. After each review hearing, the committee determined to keep him in confinement because he was still under investigation by the police.  At one such hearing, Defendant Thomas allegedly told Plaintiff that he would be in segregation "forever."  (Am. Compl., Page ID#158.)  At another hearing, Plaintiff explained to the committee that Sgt. Karbon had told Plaintiff and Defendant Ball that Plaintiff was not a suspect in the MSP investigation.  In response, Ball denied being present at the interview with Karbon.

On December 1, 2011, Plaintiff received a memorandum from Defendant Ball stating that Plaintiff was still under investigation by the MSP, and that he would remain in segregation until the issue was resolved.  (12/1/11 Ball Memo., docket #1-2, Page ID#41.)

On December 6, 2011, Plaintiff filed another grievance complaining about his confinement in segregation.  Deputy Warden Sharp rejected the grievance, stating that Plaintiff was in segregation because of a misconduct conviction for possession of dangerous contraband.[1] However, Plaintiff asserts that he received a separate punishment for that misconduct:  seven days in "toplock" and fourteen days of loss of privileges.  (Am. Compl., docket #23-1, Page ID#159.) Thus, according to Plaintiff, that misconduct was not the basis for his confinement in administrative segregation.  Plaintiff appealed that grievance to step II of the grievance appeal process, but Warden Curtin denied the appeal.  Defendant Heyns subsequently denied Plaintiff's appeal at step III of the grievance appeal process.

---

[1]When Plaintiff was moved to segregation, prison officials found a match and a striker in his belongings.

On January 13, 2012, Plaintiff received a memorandum from Inspector Schiebner stating that he had contacted Sgt. Karbon, who confirmed that the police investigation was still pending. (1/13/12 Schiebner Memo., docket #1-2, Page ID#42.) Schiebner informed Plaintiff that he would remain in segregation until the close of the police investigation.

Plaintiff subsequently wrote a complaint about his confinement in segregation to Ombudsman Barber. On July 26, 2012, he received a response from Barber's office, stating, "Based on confirmation of ECF staff . . . your placement in segregation is appropriate and not in violation of policy." (Am. Compl., docket #23-1, Page ID#160.)

On September 18, 2012, Plaintiff met with RPA Curely, who stated that he was "only here to see if [Plaintiff] was all right." (Am. Compl., docket #23-1, Page ID#160.) Curely indicated that Plaintiff "look[ed] all right to him" and "that was all he needed." (*Id.*) Curely then "continued" Plaintiff's confinement in segregation. (*Id.*)

Under MDOC policy, Warden Curtin was supposed to personally interview Plaintiff after his first six months of segregation, but Plaintiff alleges that she did not do so. Plaintiff filed a grievance about the issue, and Curtin allegedly falsified a segregation review form to show that she had personally interviewed Plaintiff in front of his cell on September 19, 2012. ARUS McCarey denied Plaintiff's grievance at step I of the grievance process, Warden Curtin denied it at step II, and Director Heyns upheld the grievance response at step III.

As of July 2013, when Plaintiff filed his amended complaint, he had been confined in administrative segregation for almost two years. He asserts that the security classification committee's reviews of his confinement are merely "paper shuffling," and that the committee's

stated reason for keeping him in segregation (an ongoing police investigation) is merely a pretext to keep him there indefinitely.  (Am. Compl., docket #23-1, Page ID#162.)

Plaintiff's transfer to, and ongoing confinement in, administrative segregation has impacted him in several ways.  When he was moved into segregation, prison officials took his personal property and placed it in storage.  That property included over $80.00 worth of "food items" that are now inedible.  (*Id.*)  In addition, Plaintiff lost his prison job and he has not been allowed to work, depriving him of the opportunity to earn money.

Also, Plaintiff is not able to attend group religious services.  Plaintiff is a practicing Muslim.  When he sent a request to Warden Curtin to attend Nation of Islam religious services, Curtin forwarded the request to Chaplain Duby.  Chaplain Duby denied the request, stating that, "per policy, religious programming shall not be provided [to Plaintiff] in a group setting," for as long as he is in segregation.  (*Id.* at Page ID#165.)

Based on the foregoing facts, Plaintiff claims that Defendants have violated the following constitutional rights: (1) the right to practice his religion (First Amendment); (2) the right to due process (Fifth and Fourteenth Amendments); (3) the right to a speedy trial (Sixth Amendment); (4) the right to avoid excessive force and cruel and unusual punishment (Eighth Amendment); and (5) the right not to be held in segregation without probable cause (Fourth Amendment).

He also claims that Defendants have treated him differently from other inmates, without justification, thereby violating his right to equal protection.  The other inmates who were in the recreation area when Blythewood was assaulted were merely questioned about the assault, but Plaintiff allegedly was singled out because he is "openly gay" and prison officials assumed that he

- 8 -

must have "lured" Blythewood into the recreation area.  (*Id.* at Page ID#164.)  Also, though other prisoners in segregation can be released back to the general population after 30 to 60 days if their behavior warrants it, Defendants will not release Plaintiff based on his good behavior, despite the fact that he has not been found guilty of a misconduct while in segregation.

### 2.  *Confiscation of funds*

Plaintiff further alleges that prison officials "arbitrarily" placed an "illegal debt" of $525.00 on his prison account, and then withdrew funds to satisfy that debt.  (*Id.* at Page ID#171.) After prison officials moved Plaintiff into segregation, they allegedly searched his personal property in an attempt to find a connection between Plaintiff and the assault.  They discovered receipts showing that Blythewood's brother sent money to Plaintiff several times over the course of a year, from September 2010 to August 2011.

On August 26, 2011, Plaintiff received a NOI to remove $525.00 from his prison account because his receipt of funds from Blythewood's brother allegedly violated MDOC policy. MDOC Policy Directive 04.02.125 provides that funds from a family member of another prisoner may not be credited to a prisoner's account, unless the funds are received to purchase hobby-craft items or the sender is a family member of the recipient.  Blythewood's brother is not a member of Plaintiff's family (and Plaintiff does not claim that the funds were received to purchase hobby-craft items).  Plaintiff contested the NOI at a hearing, claiming that he was not aware of the policy, and that prison officials were required to inform him of any reason for rejecting his funds when it received them, not after they placed them in his account.  Thus, according to Plaintiff, MDOC policy did not permit prison officials to remove the funds from his account.

Defendant Bradley, the hearing officer, upheld the NOI and determined that the funds should be removed.  Plaintiff filed a grievance challenging Bradley's decision, and Defendants Beckwith, Howes, and Heyns each upheld Bradley's decision at different stages of the grievance process.  Plaintiff also submitted a complaint to Ombudsman Barber, who determined that the grievance responses appeared to be reasonable and not in violation of policy.  Thus far, the MDOC has taken $351.04 from Plaintiff's prison account to return the money that he received from Blythewood's brother.

Plaintiff claims that the removal of those funds violated his right to due process and equal protection.  He also alleges that state-court relief is not available to him to recover those funds because more than a year has passed since they were confiscated, and Mich. Comp. Laws § 600.6431(1) provides that a claim may not be brought more than a year after the incident occurred.

### 3.  *Habeas corpus appeal*

On August 30, 2011, Plaintiff learned that the Court of Appeals for the Sixth Circuit denied his appeal from the dismissal of a federal habeas corpus action.  He then requested assistance from the prison legal writer program to appeal the Sixth Circuit's decision to the United States Supreme Court.  Plaintiff's request was granted, but the individuals working on his case incorrectly calculated the appeal deadline as November 30, 2011 (the correct deadline was November 28), and then failed to file the appeal by November 30.  As a result, the Supreme Court denied Plaintiff's petition as untimely.

Plaintiff alleges that the prison librarian, Defendant Little, was responsible for supervising the prison legal writer program at the time.  She met with Plaintiff several weeks before the filing deadline and assured him that his petition was being prepared and that it would be filed

- 10 -

before the deadline. Plaintiff asserts that she neglected to properly train and supervise the prison

legal writers. After his appeal was dismissed, he filed a grievance about the issue. Defendant

Sanders denied the grievance at step I of the grievance process, and Defendants Curtin and Heyns

denied it at steps II and III, respectively. Plaintiff also complained to Ombudsman Barber, but

Barber failed to respond to Plaintiff's complaint. Plaintiff contends that Defendants deprived him

of due process and his right of access to the courts.

    As relief for the foregoing claims, Plaintiff requests an injunction requiring his

release from segregation as well as nominal, punitive, and compensatory damages, including:

compensation for the money removed from his prison account, relief from debts incurred as a result

of his segregation (because he cannot earn money while in segregation, Plaintiff has taken out loans

to purchase personal items and pay for personal expenses), and compensation for the $80.00 worth

of food items that perished in storage.

### III. Amended Complaint (Analysis)

    A complaint may be dismissed for failure to state a claim if "'it fails to give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include

more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."). The court must determine whether the complaint contains "enough

facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.

Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for

more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more

than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that

the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also*

*Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility

standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1)

and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a

right secured by the federal Constitution or laws and must show that the deprivation was committed

by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v.*

*Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).  Because § 1983 is a method for vindicating

federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to

identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271

(1994).

## A.  Supervisory Liability

Plaintiff's only allegation against Defendant Barber is that he rejected or failed to

respond to Plaintiff's complaints about his confinement in segregation.  Government officials may

not be held liable for the unconstitutional conduct of subordinates under a theory of respondeat

superior or vicarious liability.  *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*,

436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).  A claimed

- 12 -

constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 575; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). In addition, defendants are not liable merely because they denied an administrative grievance or failed to act based upon information contained in a grievance. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "A supervisory official's failure to supervise, control or train [another individual] is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Id.* (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982); *see also Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Plaintiff has not alleged that Defendant Barber participated in any unconstitutional conduct. Consequently, as the Court stated in its April 19, 2013 opinion, Plaintiff does not state a claim against him.

### B. Municipal Liability

Plaintiff asserts in his amended complaint that the MDOC and MDOC Director Daniel Heyns are subject to "municipal liability" because Plaintiff's confinement in segregation is based on an MDOC policy that is "unconstitutionally vague." (Am. Compl., docket #23-1, Page ID#168; Mot. for Reconsid. 28, docket #41, Page ID#398.) Prison officials allegedly told Plaintiff that he must remain in segregation until the completion of the state police investigation, as required

by MDOC Policy Directive 04.05.120 ¶ L(4).  That policy provides that a prisoner may be classified to administrative segregation if:

> [t]he prisoner is under investigation by an outside authority for suspected felonious behavior and it is reasonably believed that the prisoner needs to be segregated while the investigation is pending. If classified to administrative segregation for this reason, the prisoner shall be reclassified when it is no longer believed that the prisoner needs to be segregated due to the pending investigation or the investigation is completed, whichever comes first.

*Id.* (effective Sept. 27, 2010).  Plaintiff contends that the foregoing policy does not specify whether evidence of guilt is required to transfer a prisoner to administrative segregation.  Because Director Heyns issued the policy, Plaintiff contends that he is liable for failing to prevent his subordinates from applying it in a way that violates Plaintiff's constitutional rights.

Plaintiff's municipal liability claim against Heyns and the MDOC is without merit for several reasons.  First, the MDOC is entitled to sovereign immunity for § 1983 claims brought in federal court.  *See McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010); *Turnboe v. Stegall*, No. 00-1182, 2000 WL 1679478, at *2 (6th Cir. Nov. 1, 2000).  In addition, the State of Michigan (acting through the MDOC) is not a "person" who may be sued under § 1983 for damages.  *See Lapides v. Bd. of Regents*, 535 U.S. 613 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)).

Second, Director Heyns and the MDOC are not subject to municipal liability because they are not municipal entities.  Instead, the MDOC is a department of the State of Michigan, and as director of that department, Heyns acts on behalf the state rather than a municipality.

Third, as discussed with regard to Defendant Barber in Section III.A *supra*, Director Heyns is not liable under § 1983 for failing to prevent or correct the allegedly unconstitutional actions of his subordinates.

- 14 -

Finally, to the extent Plaintiff contends that the policy itself is unconstitutional, he is mistaken. Plaintiff does not have a constitutional right to be confined in segregation only when prison officials can prove he is guilty of misconduct. Prison officials necessarily have "broad discretionary authority" to use segregation as a means to manage the prisoners in their care, and there are many possible legitimate reasons for its use that do not require proof of misconduct. *See Hewitt v. Helms*, 459 U.S. 460, 467-73 (1983) (describing possible reasons for use of segregation). For example, where a prisoner is merely suspected of misconduct, and there is an ongoing investigation, segregation may be appropriate to insulate possible witnesses from coercion or harm. *Id.* at 473; *see also Jones v. Baker*, 155 F.3d 810, 812-13 (6th Cir. 1998) ("When a prisoner is implicated in the killing of a prison guard during a large prison riot, it is not unreasonable for corrections officials to make some adjustment in the conditions of his or her imprisonment until a full and thorough investigation is completed."). Thus, a policy allowing prison officials to segregate a prisoner if they "reasonably believe" that it is necessary while an outside police investigation is pending does not offend any constitutional rights.

## C.  Eighth Amendment

Plaintiff contends that his confinement in segregation violates the Eighth Amendment because it is "excessive," "unnecessary," and "arbitrary" to place him in conditions "involving solitary confinement" without a determination of guilt. (Am. Compl., docket #23-1, Page ID##165-66.) The Eighth Amendment prohibits any punishment which violates the civilized standards of humanity and decency, or involves the unnecessary and wanton infliction of pain. *See Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). "'Because placement in segregation is a routine discomfort that is a part of the penalty that criminal offenders pay for their offenses against society, it is

- 15 -

insufficient to support an Eighth Amendment Claim.'" *Harden-Bey v. Rutter*, 524 F.3d 789, 795-96 (6th Cir. 2008) (quoting *Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003)).  "To move beyond the pleading stage in this setting, an inmate must allege that he has been deprived 'of the minimal civilized measure of life's necessities.'" *Id.* at 795 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation[,]" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348.

Although it is clear that Plaintiff has been denied certain privileges as a result of his administrative segregation, including contact with other inmates, a prison job, and religious services,[2] he does not allege that he has been denied basic human needs and requirements.  Thus, he does not state an Eighth Amendment claim.

### D.  Access to the Courts

Plaintiff asserts that Defendant Little's failure to train or supervise prison legal writers resulted in the loss of an opportunity to file an appeal in his federal habeas corpus proceedings, thereby violating his right of access to the courts.  Plaintiff cannot hold Little liable merely because she failed to adequately supervise the individuals who were working on his appeal. *See* Section III.A *supra*.  Plaintiff does not allege that she approved or otherwise participated in any conduct leading to his injury.  Consequently, he does not state a viable § 1983 claim against her.

Even if she was directly involved in the conduct leading to the late filing of his appeal, Plaintiff has not stated a claim because he has not alleged a cognizable injury.  It is clearly

---

[2]In his original complaint, Plaintiff also alleged that he has been allowed to exercise only one hour a day, five days a week.  For the reasons discussed in the Court's April 19, 2013 opinion, those allegations are insufficient to state a claim.

established that prisoners have a constitutionally-protected right of access to the courts under the First and Fourteenth Amendments. *See Lewis v. Casey*, 518 U.S. 343, 354 (1996); *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). In order to state a viable claim, however, a plaintiff must plead facts showing "actual injury" to a nonfrivolous legal claim. *See Lewis*, 518 U.S. at 349, 351-53. To plead actual injury, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3). Where, as here, the prisoner lost an opportunity to pursue a claim, that claim "[must] be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id.* at 416-17.

In its April 19, 2013 opinion, the Court noted that Plaintiff failed to satisfy the foregoing pleading requirements because he did not identify any of the arguments that he intended to raise on appeal. In what may be an attempt to comply with this requirement, Plaintiff offers a lengthy explanation as to why he believes that his petition for habeas corpus should not have been dismissed as untimely and, thus, why his thwarted attempt to appeal that dismissal to the United States Supreme Court was not frivolous. (*See* Am. Compl., docket #23-1, Page ID##175-80; *see also* Mot. for Reconsid., docket #41, Page ID##410-14.) However, to satisfy the pleadings requirements set forth in *Christopher*, it is not enough that Plaintiff describe the nature of his potential arguments on appeal. His appeal to the United States Supreme Court attempted to challenge the dismissal of his habeas corpus action on procedural grounds, but if the *underlying claims* in his habeas corpus petition were frivolous, then he did not suffer injury to a nonfrivolous

- 17 -

legal claim.  Thus, he also needed to plead the underlying claims in his habeas corpus action, "just as if [they] were being independently pursued."  *See Christopher*, 536 U.S. at 417.  Because he has not done so, he fails to state a claim.

Furthermore, as the Court discussed in its prior opinion, Plaintiff fails to state a claim for the additional reason that the court records in his habeas action indicate that his appeal to the Supreme Court was almost certain to fail.  His petition for habeas corpus was filed in 2010, but it attacked a 1991 conviction that he did not challenge until 2007, when he filed a motion for relief from judgment in state court.  (Am. Compl., Page ID#175.)  Ruling on a motion to dismiss the petition for habeas corpus as untimely, the district court determined that the one-year statute of limitations expired in 1993, many years before Plaintiff filed his petition.  *See Hollins v. Howes*, No. 2:10-cv-11131, 2010 WL 4823218, at *2 (E.D. Mich. Nov. 22, 2010).  Plaintiff sought leave to appeal the district court's decision, but the Court of Appeals for the Sixth Circuit refused to even grant a certificate of appealability, holding that it was not even "debatable" whether the district court was wrong in its procedural ruling.  *Hollins v. Howes*, No. 10-2700, ord. at 2 (6th Cir. Aug. 30, 2011).[3]  None of Plaintiff's arguments to the contrary is persuasive.[4]  Thus, even if Plaintiff had

---

[3]The Sixth Circuit did note that the district court wrongly determined that the statute of limitations expired in 1993.  Instead, the limitations period expired in 1997, one year after the statute creating the time limit became law.  Nevertheless, the Sixth Circuit held that the district court was correct to dismiss the petition as untimely, because it was filed many years after the 1997 deadline.

[4]Plaintiff contends that it is improper to apply the statute of limitations "retroactively" to his petition (Am. Compl., docket #23-1, Page ID#175), but as the Sixth Circuit noted in its order, there is no retroactivity issue when the one-year limitations period starts to run after the effective date of the statute.  *See Hollins*, No. 10-2711, ord. at 3 (citing *Burns v. Morton*, 134 F.3d 109, 111 (3d Cir. 1998)).  Plaintiff also contends that the statute of limitations does not apply to a prisoner's first petition for habeas corpus, but there is no support for that position in the law.  There are cases holding that the second-or-successive limitation in 28 U.S.C. § 2244(b) does not apply to a *second* petition, if the first was filed before the effective date of the AEDPA, *see, e.g.*, *Cress v. Palmer*, 484 F.3d 844, 852 (6th Cir. 2007), but those cases do not apply because the second-or-successive limitation was not at issue in Plaintiff's case.  Plaintiff claims that it was not his burden to show that his petition was timely because the statute of limitations is an affirmative defense.  However, the respondent raised the statute of limitations as a defense in a motion to dismiss; thus, Plaintiff was obligated to overcome that defense.

adequately identified all of his grounds for habeas corpus relief in his complaint, he cannot show that he suffered a cognizable injury because his appeal to the United States Supreme Court was based on nothing more than hope for a more favorable result.  For all the foregoing reasons, therefore, Plaintiff fails to state an access-to-the-courts claim.

### E.  First Amendment (exercise of religion)

Plaintiff contends that Chaplain Duby denied him permission to attend Nation of Islam religious services based on a policy prohibiting group services for inmates confined in segregation.  *See* MDOC Policy Directive 04.05.120 ¶ W(1) (effective Sept. 27, 2010) (providing that "religious programming" is provided to prisoners in administrative segregation "to the extent [it is] administratively feasible and can be safely afforded," but that "[s]uch privileges shall not be provided in a group setting.").[5]

While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion.  *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted).  A prison regulation that impinges on a prisoner's right to exercise his religion is valid as long as it is reasonably related to legitimate penological interests.  *Phelps v. Dunn*, 965 F.2d 93, 98 (6th Cir. 1992) (citing *O'Lone*, 482 U.S. at 349).  At this stage of the case, the Court concludes that Plaintiff states a religious-exercise claim.  A blanket ban on group services for all prisoners confined in segregation, including Plaintiff, who has been confined there for nearly two years because of an unresolved police investigation into suspected misconduct, may not be reasonably related to legitimate penological interests.  The Court assumes that Defendant Heyns is the policymaker for

---

[5]Plaintiff did not identify the specific policy in his amended complaint, but he does mention it in his first motion for reconsideration.  (*See* Obj., docket #9, Page ID#117.)

the MDOC.  Consequently, the Court concludes that Plaintiff states a claim for prospective injunctive relief against Defendant Heyns.  This conclusion is at odds with the Court's April 19, 2013 opinion, which held that Plaintiff's original complaint did not state a religious-exercise claim and dismissed Defendant Heyns for failure to state a claim.  Instead, the Court will allow Plaintiff's free-exercise claim to proceed and will order service of the amended complaint on Defendant Heyns.

### F.  Equal Protection

Plaintiff claims that Defendants have violated his right to equal protection by confining him in segregation.  The other inmates present in the recreation area when Blythewood was assaulted were not placed in segregation.  Instead, they were merely questioned about the incident.  In addition, while other inmates in segregation can be released back to the general prison population after 30 to 60 days based on their behavior, Defendants have not permitted Plaintiff's release.

The Equal Protection Clause commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals.  *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976).  Plaintiff does not allege that he is a member of a suspect class, or that Defendants interfered with a fundamental right.  Because neither a fundamental right nor a suspect class is at issue, the rational basis review standard applies. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby,* 470 F.3d 286, 298 (6th Cir. 2006). "Under rational basis scrutiny, government action amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.'"  *Id.*

- 20 -

(quoting *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005)). In other words, Plaintiff must demonstrate that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

To the extent Plaintiff contends that Defendants treated him differently because he is gay, his contention is unsupported by any facts. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

To the extent Plaintiff contends that Defendants treated him differently from the other inmates who were present when Blythewood was assaulted, his allegations indicate that he was not similarly situated with those inmates. Plaintiff acknowledges that the assault itself was not witnessed by any prison officials, but he was seen accompanying Blythewood to the area where the assault occurred. (*Id.*) Plaintiff does not allege that any of the other inmates were similarly situated in that respect. Absent clear evidence implicating another prisoner, prison officials could have reasonably determined that Plaintiff's presence with Blythewood immediately prior to the assault warranted further investigation to determine if Plaintiff was responsible for that incident.

Moreover, according to the complaint, Defendants' asserted reason for transferring Plaintiff to segregation after the initial investigation was that the state police were investigating his involvement in the assault. Plaintiff does not contend that any of the other inmates were also under investigation by the state police. Thus, Plaintiff has not alleged conduct by Defendants that is arbitrary and irrational in relation to their treatment of other, similarly-situated prisoners.

To the extent Plaintiff contends that he has been treated differently from prisoners convicted of a misconduct, who can be released from segregation based on their behavior, Plaintiff is not similarly situated with such prisoners. His extended confinement in segregation is ostensibly due to an outside police investigation, not a misconduct conviction. It is not unreasonable to segregate a prisoner who is the subject of an ongoing police investigation into his role in the killing of another inmate. *See Jones v. Baker*, 155 F.3d at 812-13.

Finally, Plaintiff claims that Defendants violated his right to equal protection when they confiscated his funds, but this claim is wholly conclusory. He does not allege that he has been treated differently from other prisoners. In sum, therefore, Plaintiff does not state an equal protection claim.

## G. Due Process

Plaintiff asserts that Defendants violated his right to due process when they confiscated funds from his account and confined him in segregation. "The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). In addition, "the deprivation by state action of a constitutionally protected interest in 'life, liberty or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original). Thus, analysis of a procedural due process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon

- 22 -

that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

### 1. Confiscation of funds

Regarding the confiscation of Plaintiff's funds, he has a property interest in those funds. The Supreme Court has repeatedly held that "some kind of hearing is required at some time before a State finally deprives a person of his property interests. The fundamental requirement of due process is the opportunity to be heard and it is an 'opportunity which must be granted at a meaningful time and in a meaningful manner.'" *Parratt v. Taylor*, 451 U.S. 527, 540 (1981) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *see also Fuentes v. Shevin*, 407 U.S. 67, 80–81 (1972) (holding that procedural due process requires notice and an opportunity to be heard before the government deprives an individual of his possessions).

Plaintiff acknowledges that he received notice and a hearing before his funds were confiscated, and he acknowledges that he was able to challenge the hearing decision through the grievance process. He does not specifically identify any shortcomings in those proceedings, other than that the hearing officer's decision was arbitrary and unauthorized by prison policy. According to Plaintiff, prison policies authorized prison officials to reject funds sent to him by an outside party, but they did not authorize the removal of funds from his account one year after they were processed and credited to him.

Plaintiff's claim is subject to the rule in *Parratt*, 451 U.S. at 527, *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists,

the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984). Where *Parratt* applies, the plaintiff must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). A prisoner's failure to sustain this burden requires dismissal of his action. *Brooks v. Dutton*, 751 F.2d 197, 199 (6th Cir. 1985).

In a case similar to Plaintiff's, the Sixth Circuit noted that prison policy did not give the defendants the authority to retain the plaintiff's money after it was withdrawn; thus, *Parratt* applied because the defendants' "unauthorized departures from prison policy directives were beyond the State's reasonable control." *Copeland*, 57 F.3d at 479. Similarly, Plaintiff claims that prison policy did not give officials the authority to remove money from his prison account long after it was credited to him. Assuming that his allegations are true, then their conduct was "unauthorized" and *Parratt* applies to his claim. Plaintiff has not satisfied the pleading requirements of *Parratt*, however. He does not allege that post-deprivation remedies were inadequate to remedy his loss. In *Copeland*, the Sixth Circuit found that Michigan law provides "several adequate post-deprivation remedies" for the unauthorized removal of funds from a prisoner account. *Id.* at 480 (describing several such remedies). Plaintiff does not allege any reason why these remedies were inadequate. Plaintiff contends that it is too late for him to file a state-court action, but that does not mean that such an action was an inadequate remedy; it simply means that he neglected to pursue it. He cannot complain that the state deprived him of due process when he failed to take advantage of the process available to him. Thus, under *Parratt*, he does not state a claim.

- 24 -

In his motion for reconsideration, Plaintiff asserts that the Court is improperly requiring him to exhaust his claim in state court before raising it in a § 1983 action. To the contrary, the Court is requiring Plaintiff to plead sufficient facts to state a viable claim. Plaintiff was not required to pursue a state-court action before bringing a due process claim in federal court; if a state-court action was not adequate to remedy his loss, it would have made little sense for him to bring one. Instead, he was required to plead the facts required by *Parratt*. Because he did not do so, his claim must be dismissed.

## 2. Segregation

Plaintiff also alleges that Defendants deprived him of due process by transferring him to segregation without an adequate opportunity to respond to allegations that he was involved in the assault on Blythewood, and without meaningful review of his ongoing confinement in segregation for over sixteen months.

The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a prisoner's loss of liberty implicates a federally cognizable liberty interest protected by the Due Process Clause. According to the *Sandin* Court, a prisoner is entitled to the protections of due process only when a deprivation "will inevitably affect the duration of his sentence" or imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995).

Confinement in administrative segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt*, 459 U.S. at 468. It will implicate a liberty interest only if it "imposes an 'atypical and significant' hardship on the inmate 'in relation to the ordinary incidents of prison life.'" *Jones v. Baker*, 155 F.3d 810, 811 (6th Cir. 1998) (quoting *Sandin*, 515 U.S. at 483). To determine whether a liberty interest is at stake, the hardship must be weighed in light of the nature of the more-restrictive confinement and its duration. *Harden–Bey*, 524 F.3d at 794.[6]

The *Sandin* Court concluded that mere placement in administrative segregation did not implicate a liberty interest because the segregation at issue in that case (disciplinary segregation for 30 days) did not impose an atypical and significant hardship. *Sandin*, 515 U.S. at 484. Similarly, the Sixth Circuit has held that mere placement in administrative segregation, or placement for a relatively short period of time, does not require the protections of due process. *Rimmer-Bey*, 62 F.3d at 790-91; *see Joseph v. Curtin*, 410 F. App'x 865, 868 (6th Cir. 2010) (61 days in segregation is not atypical and significant). The Sixth Circuit has also held, in various circumstances, that confinement in administrative segregation for a relatively long period of time does not implicate a liberty interest. *See, e.g., Jones*, 155 F.3d at 812-23 (two years of segregation while the inmate was investigated for the murder of a prison guard in a riot); *Mackey v. Dyke*, 111 F.3d 460 (6th Cir. 1997) (one year of segregation following convictions for possession of illegal contraband and assault, including a 117-day delay in reclassification due to prison crowding).

---

[6]Plaintiff asserts that certain MDOC policies create a liberty interest in avoiding segregation by specifying conditions in which it may be used. (*See* Mot. for Reconsid., docket #41, Page ID##377-78.) In *Sandin*, however, the Supreme Court expressly rejected this approach to defining liberty interests, instructing courts to examine "the nature of the deprivation" at issue rather than "the language of a particular [prison] regulation." *See Sandin*, 515 U.S. at 481. As a result, after *Sandin*, even "unmistakably mandatory" language in a prison policy is not sufficient to create a protected liberty interest. *See id.* at 480, 484.

Instead, segregation is considered atypical and significant only in "extreme circumstances." *Joseph*, 410 F. App'x at 868. *See, e.g.*, *Harden-Bey*, 524 F.3d at 795 (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, *i.e.*, three years without an explanation from prison officials, implicates a liberty interest); *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012) (eight years in segregation implicates a liberty interest).

Even where a liberty interest is shown, the due process claim "is not complete unless and until the State fails to provide due process." *Zinermon*, 494 U.S. at 126. The Supreme Court has indicated that "[p]rison officials must engage in some sort of periodic review of the confinement of . . . inmates [in administrative segregation]." *Hewitt*, 459 U.S. at 477 n.9. "This review will not necessarily require that prison officials permit the submission of any additional evidence or statements." *Id.* However, the decision to continue confinement must be supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985). "This requirement balances the procedural rights of prisoner against the need of prison officials to have freedom to operate their facilities on a day-to-day basis." *Harris*, 465 F. App'x at 484. In short, where an inmate's confinement in segregation implicates a liberty interest, he is entitled to a "periodic review of his confinement, supported by some evidence or indicia of reliability." *Id.* at 485.

Plaintiff's only allegation against Hearings Officer Jacobsen is that he made the initial decision to transfer Plaintiff to administrative segregation in August 2011. Plaintiff's confinement was then subject to regular review by the security classification committee, starting in October 2011. Jacobsen's initial placement decision did not implicate Plaintiff's right to due process. Under *Sandin*, *Rimmer-Bey*, and *Joseph*, mere placement in segregation does not implicate a liberty interest, and because Jacobsen's decision was subject to further review by the security

classification committee in two months' time, it did not impose an atypical and significant hardship. Similarly, to the extent that Plaintiff sues ADW Beckwith because she initially recommended that Plaintiff be placed in segregation, he does not state a due-process claim against her.

In his motion for reconsideration, Plaintiff rightly asserts that the Court is required to consider the circumstances of his confinement in segregation to determine whether it is "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. However, Plaintiff alleges no specific details regarding the conditions of his confinement that would distinguish his case from *Sandin*, *Rimmer-Bey*, *Joseph*, or any other case in which the court determined that confinement in administrative segregation for a limited period of time does not implicate a liberty interest. *Cf. Joseph*, 410 F. App'x at 868 (holding that 61-day confinement in administrative segregation in an MDOC facility does not implicate a liberty interest).

Plaintiff implies that his initial placement in segregation implicated a liberty interest because he lost the opportunity to earn "good time credits." (Mot. for Reconsid., docket #41, Page ID#387.) However, like other prisoners who committed their offenses after April 1, 1987,[7] Plaintiff earns "disciplinary credits" under a statute that abolished the former good-time system. *See* Mich. Comp. Laws § 800.33(3). In *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007), the Court of Appeals for the Sixth Circuit determined that loss of disciplinary credits does not necessarily affect the duration of a prisoner's sentence; instead, it merely affects parole eligibility, which remains discretionary with the parole board. *Id.* at 440. Building on this ruling, in *Nali v. Ekman*, 355 F. App'x 909 (6th

---

[7]According to Plaintiff's profile in the MDOC's Offender Tracking Information System, his offenses were committed in 1991. *See* http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=217420 (visited January 13, 2014).

Cir. 2009), the court held that a misconduct citation resulting in loss of disciplinary credits does not affect a prisoner's constitutionally protected liberty interests, because it does not necessarily affect the length of confinement. *Id.* at 912. Thus, the loss of an opportunity to earn disciplinary credits does not deprive Plaintiff of a liberty interest. *Cf. Hughes v. Birkett*, 173 F. App'x 448, 451 (6th Cir. 2006) ("'The loss of an opportunity for earning disciplinary credits is a speculative, collateral consequence of a prison disciplinary conviction insufficient to create a liberty interest.'") (quoting *Underwood v. Luoma*, 107 F. App'x 543, 545 (6th Cir. 2004)). In the absence of a demonstrated liberty interest implicated by the decision to place him in segregation, Plaintiff does not state a due-process claim against Defendants Jacobsen and Beckwith. Thus, the Court discerns no basis for reconsidering its previous decision to dismiss them from the action.

In contrast, Plaintiff alleges that Defendants Ball, Bengelink, McCarey, Miniard, Sanders, Sharp, and Thomas recommended that Plaintiff continue to be confined in segregation for much longer than two months. Warden Curtin apparently approved those recommendations. Defendant Schiebner's memorandum also suggests that he may have been involved in a decision to continue Plaintiff's segregation in January 2012. In addition, RPA Curely allegedly continued Plaintiff's confinement in segregation in September 2012.

The duration of Plaintiff's extended confinement in segregation is sufficiently atypical that it may implicate a liberty interest triggering a right to due process. Moreover, Plaintiff's allegations suggest that the reviews he received by Defendants may not have been adequate to protect that right. Thus, at this stage of the case, the Court will allow Plaintiff's due process claim to proceed against Defendants Ball, Bengelink, Curely, Curtin, McCarey, Miniard, Sanders, Schiebner, Sharp, and Thomas. Because Defendants Bengelink, Curely, Miniard, and

Sharp have not been served in this action, the Court will order service of the amended complaint on them.

## H. Sixth Amendment

In his amended complaint, Plaintiff further claims that he has been deprived of the right to a speedy trial because he has been "held to answer" for a crime that he has not been charged with. (Am. Compl., docket #23-1, Page ID#167.) The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. The right to a speedy trial "attaches only when a formal criminal charge is instituted and a criminal prosecution begins." *United States v. MacDonald*, 456 U.S. 1, 6 (1982). The Speedy Trial Clause "does not apply to the period before a defendant is indicted, arrested, or otherwise officially accused." *Id.*

Plaintiff does not allege that he has been arrested, indicted, or officially accused of a crime. He was merely placed in administrative segregation pending an investigation. Placement in administrative segregation is not treated as an arrest triggering a right to a speedy trial. *See United States v. Mills*, 810 F.2d 907, 909 (9th Cir. 1987) (collecting cases). Thus, Plaintiff has not been deprived of that right.

## I. Fourth Amendment

Plaintiff also claims that his Fourth Amendment rights have been violated because prison officials lack probable cause to confine him in segregation. (*See* Am. Compl., docket #23-1, Page ID#167.) The Fourth Amendment protects against unreasonable searches and seizures, including warrantless arrests without probable cause. Plaintiff's claim is without merit because he was already in state custody by virtue of his criminal convictions when Defendants allegedly

- 30 -

"seized" him and placed him in segregation. In other words, he was already lawfully subject to all the limitations on liberty incident to arrest and imprisonment, including the possibility of confinement in segregation. *See Hewitt*, 459 U.S. at 468 (noting that "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration"). Thus, transferring him from one area of the prison to a more restrictive area did not constitute a "seizure" under the Fourth Amendment, and did not require a warrant or probable cause. *Cf. Morris v. Metrish*, No. 97-1624, 1998 WL 246454, at *2 (6th Cir. May 5, 1998) ("[Plaintiff's] claim that his classification to administrative segregation was an unlawful detention in violation of the Fourth Amendment is frivolous because prisoners have no reasonable expectation of privacy in their cells."). Consequently, Plaintiff does not state a Fourth Amendment claim.

### J. Prison Policies

Plaintiff asserts that the conduct of various Defendants violated prison policies. For instance, he claims Defendant Bradley's decision to confiscate his funds was not authorized by prison policy. He also claims that Defendants responsible for confining him in segregation have misapplied prison policies regarding its use. A violation of prison policy does not, by itself, state a constitutional claim under § 1983. *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992); *McVeigh v. Bartlett*, No. 94-23347, 1995 WL 236687, at *1 (6th Cir. Apr. 21, 1995) (failure to follow policy directive does not rise to the level of a constitutional violation because policy directive does not create a protectable liberty interest). Section 1983 is addressed to remedying violations of federal law, not state law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924

- 31 -

(1982); *Laney*, 501 F.3d at 580-81. Thus, to the extent Plaintiff's § 1983 claim rests solely on a violation of state law or prison policy, he does not state a claim.

### IV. Motion for Reconsideration

Plaintiff's motion for reconsideration seeks to reinstate some of the claims and Defendants that were dismissed in the Court's April 19, 2013 opinion. The Court has considered Plaintiff's arguments in connection with its review of the amended complaint. To the extent Plaintiff seeks to revive his First Amendment claim regarding his right to practice his religion, his motion is moot because the Court will allow that claim to proceed as set forth in his amended complaint. To the extent Plaintiff attempts to revive any of his other claims, his motion is without merit for the reasons stated in this Opinion. Consequently, Plaintiff's motion will be denied.

### Conclusion

For the foregoing reasons, Plaintiff's motion to amend the complaint will be granted. After review of the amended complaint, the Court concludes that it states a due process claim against those Defendants who were involved in review and/or approval of his extended confinement in segregation (Defendants Ball, Bengelink, Curely, Curtin, McCarey, Miniard, Sanders, Schiebner, Sharp, and Thomas). It also states a First Amendment claim against Defendant Heyns regarding Plaintiff's inability to attend group religious services. Thus, the Court will allow those two claims to proceed, and will order service of the amended complaint on Defendants Bengelink, Curely, Heyns, Miniard, and Sharp, because they have not been served.

However, the allegations in Plaintiff's amended complaint do not alter the disposition of any of Plaintiff's other claims. Plaintiff's amended complaint does not state a claim under the

Fourth, Fifth, Sixth, or Eighth Amendments.  Nor does it state an equal protection claim, an access-to-the-courts claim, or a municipal-liability claim.  In addition, it does not state a claim insofar as it challenges Plaintiff's initial placement in segregation or the confiscation of his funds.  Thus, with the exception of Defendant Heyns, it does not state a claim against the Defendants who have already been dismissed from the action (Defendants Barber, Beckwith, Bradley, Howes, Jacobsen, and Little).

An order will be entered that is consistent with this Opinion.


Dated:  January 29, 2014                    /s/ Janet T. Neff                              
                                            Janet T. Neff
                                            United States District Judge